Good morning. May it please the court. The TDCJ executive defendants moved this court to reverse the district court and render judgment granting them qualified immunity because clearly established law has not put the constitutionality of their actions beyond debate. Clearly established law needs to be so clear that every reasonable official would have known and understood that what they were doing was wrong. The controlling authority also requires a high degree of particularity and specificity with regard to those contours of the clearly established law. The TDCJ executive defendants point to three specific cases stating that to establish clearly established law. First, Gates, Valagura, and Ruiz. In Gates, it was determined that where there are temperatures in prisons above the 90s, there must be mitigation measures taken. In other words, the standard was remedial measures are required when there are temperatures above the 90s. In Valagura, in that case, the court found that while there was a fact dispute as to the personal involvement of the wardens and below lower level defendants, that again, temperatures in excess of the 90s without remedial measures was a substantial, could possibly be a substantial threat under the 8th amendment. The district court in their order did not follow the analysis requiring that there be clearly established law. The district court stated in general, it says, there is clearly established law of a constitutional right to be free from extreme temperatures. That is a general statement of the law. No one disputes that. But what the court left out of its analysis is that clearly established law requires the particularity that without remedial measures, extreme temperatures can violate the constitution. The defendants... I mean, how many people have to die before these officials would be held accountable? Before these particular officials? Right. I mean, your argument is about these officials, and I get that, and that's the right argument to make. But I'm just, it seems like we have person after person. It's established. It's documented. It's known. And yet, this continues to go on, and these guys, their argument is, well, you know, we didn't really understand any law. We just were confused or whatever. There's nothing to tell us what we're supposed to do, and people continue to die. Okay. No, your honor. In fact, these illnesses have been unpredictable and rare at TDCJ. If you take a look at the charts that the plaintiffs present, yes, there have been intermittent deaths at TDCJ, alleged deaths. However, there are significant periods of time where there are no deaths. Alleged deaths? I mean, did they die or not? They died, yes. They died in TDCJ custody. There's no dispute that they died. And it is not this complicated to think. I mean, we don't let people put animals in hot cars. Why? Because when you, the hotter it gets, the more damaging it is to somebody. So this isn't a difficult principle, and it's known in Texas, and it's known to these three officials. And so my statement to you is what is it going to take to get them to do something to mitigate, you said, mitigate the heat? Well, is the heat being mitigated? It doesn't seem like it is. Because we had the case of Blackman. That was several years ago. That doesn't seem to have made any impact. Blackman was not... I know it was the warden, but nonetheless, it's still an extreme heat case. Okay. There's several parts to your question, all of which are important to answer, and I'd like to take them one at a time, if I may. Sure. First, there are remedial measures in place. These executives did adopt policies. And in fact, if you look at TDCJ as a whole, with 150,000 prisoners, these policies are successful. And there are numerous years, nine out of 14 of them, where these events, these types of deaths did not occur. These deaths are unpredictable. And the plaintiffs themselves, if you look at their brief on page 39, in a footnote, you may recall, and I'll read the footnote in just a moment, but you may recall that throughout their complaints and in their brief, they consistently state cooling is the solution. Cooling is the mitigation measure. They're artful, because they don't say it's constitutionally required. But nonetheless, every remedy that they propose, well, it has to do with cooling. You should have taken the prisoners in a cooler environment. And yet, while they recommend that repeatedly throughout all their pleadings, their own footnote states that where they recommend cooling to 88 degrees, for example, a temperature far from comfortable probably would have prevented the deaths. The point here is that we are not able to prevent every death. Under established law, a reasonable official enacting reasonable policies can have a bad outcome in certain incidents and still retain their qualified immunity. And if you look at what they're really saying here, on each of these days, TDCJ was taking care of more than 150,000 prisoners. And yes, there were isolated, unpredictable events that we clearly understand we've got to explain at the trial court level what happened on the ground. But system-wide, when you take a look at system-wide, you are not, their policies are working. And the remedial measures and the things that they do to implement those measures are working. Now, there are dozens of decisions made about every offender in TDCJ in many different places and in many different ways. For example, they are assessed medically. They are assessed height and weight. They are assessed as far as gang backgrounds. They are assessed for what kind of jobs and things they're capable of doing. There's multiple assessments that are made of these prisoners. And so that's why we emphasize to this court, by our motion to dismiss on behalf of the executive defendants, that does not mean that we are not going to take a look from the regional director below in these cases as to specifically what happened. You're saying somebody else should be held accountable rather than these three officials. I think that these three officials, yes, they should not be held accountable under clearly established law. So who should? The warden? Well, I'm not going to place blame. We are vigorously defending all of these cases and what specifically happened. We are at a pleading stage on 12B6 for the executive defendants. Ultimately, we may be filing motions for summary judgment as to the lower-level defendants. What we're saying is that at the beginning of this case, we are looking at the pleading stage about what was said about these executive defendants. And the heart, really, of what they're saying is that if you are not 100% effective, then you have to answer on an individual liability. Because they simply are not required to be 100% effective or undergo discovery and individual liability. The fact of the matter is... What is your answer to the pigs, that they said the pigs are being cooled and not the humans? Okay, well, it's not... They're not in a luxury condominium with... Well, I hope not. But they're cooler than the prisoners. Okay, well, they do not have sweat glands, and they are foaling, and pigs are a source of food. They are for the benefit of the offenders. There's 14 units that raise pigs. It's standard ranging operations. So they get greater protection because they're food for the prisoners? Yes. You may not be aware, but the Texas State runs major ranching operations of thousands of acres, raising cattle, pigs, all kinds of food. The prisoners work in these operations. And so, yes, they are being raised as food for the offenders. So they are for the benefit of the offenders. But it is not... They do not have sweat glands. Do you realize how that sounds? Right. Do you realize how that sounds? I'm sorry. No, I do not. Okay. At bottom, it still sounds like you're saying the pigs get greater protection because they're food and benefit the prison population as a whole, notwithstanding no sweat glands. No, Your Honor. It's just sort of a curious to me position. Well, it's a fact question as to exactly... But I guess it is. You don't dispute the fact that the pigs do. I have to accept it as true for purposes of this argument. And candor is always... I'm sorry to answer the question about... You are. And candor is always appreciated by the court. No doubt about that. Okay. Okay. So, again, I point the court to the chart that is attached. Because if you take a look at it, there are, prior to 2011, rare and intermittent deaths. And the second thing I ask the court to and I had jumped off of it, but they do not, in their own solution, have a means whereby we can prevent 100% of heat-related deaths. So if you look at the chart, you'll see that... Where am I looking at the chart? Okay. The document 83 filed 314.14, it's attached to each of the complaints. They talk about... You don't have a record site? Not in front of me. Okay. You can tell us on rebuttal. It's fine. No problem. But from 2007, there were three years with no deaths after that. 2008, 2009, and 2010. I mean, summers vary in how hot they are. And so the fortuity that you might have a whatever the situation is, to me, doesn't obviate the potential liability of your clients. If there's not reasonable measures being carried out, but the plaintiffs admit that they have these policies, and we did attach them and ask the court to take judicial notice of them, they are public records. These policies carry out what is required under Gates. And there is no way to 100% prevent these deaths, some deaths from heat illness. For instance, they talk a lot about acclimatization in their pleadings, for example. And acclimatization can... Those kind of deaths can occur even when you have fully cooled prisons. So reasonable... These officials, prior to 2011, had no clearly established law telling them that they must actually cool the prisons in order to avoid individual liability. They implemented and adopted complex policies in order to care for the prisoners, and in fact, did successfully care for tens of thousands of prisoners. We understand that it was unfortunate what happened in 2011, but that does not mean that these three executives should be individually liable, where they did adopt policies that comport with the Constitution. So we're asking this court not to change the law on qualified immunity, where a plaintiff can come in and say, we find something in your policy that we think is And therefore, you are, as an executive of a large state agency, you are open to individual liability as well as extensive discovery. For this reason, we're asking the court to reverse the district court's finding, where they did not fully look at the general principle that extreme temperatures without mitigating measures is what violates the Constitution, and then subject these offenders, or excuse me, subject the executives to individual liability. All right. Thank you, Ms. Burns. You've reserved rebuttal time. Mr. Edwards. I'll tell you exactly what is going to change this, and it is a ruling from this court, spelling out in no uncertain terms, people are as important as pigs, whether they're food, whether they're pets, that I have to say it to this court demeans the court, frankly. Mr. Edwards, I mean, we're not in the send a message business, and no matter what the inclination may be, I can assure you, sending the message is not what we do. We're just going to decide the case based on what we have in the law and so on and so forth, and leave sending the messages in the first case we had this morning, or sending a message in this one, or whatever, whatever, whatever. We get umpteen dozen of qualified immunity cases that come up to us in a variety of contexts. This one involves the prison, et cetera. We get the early motions for qualified immunity lobbed up. We've got very discreet jurisprudence in terms of whether we have jurisdiction, don't have jurisdiction, if it's a fact matter, et cetera, et cetera. The mosaic, if you will, is familiar territory for us if it's getting it lobbed up. Here, it's a case where there are deaths and so on and so forth. Counsel opposite says, you've got the executive defendants here, the higher ups, et cetera. There is remediation and so on and so forth. It'd probably be more helpful to sort of dive in at that spot. Why not, and so forth, and that'll help us kind of unearth how this case is we get. Well, your honor, that's exactly right. I have no intent of asking this court to send a message for the sake of sending a message. All I mean is that when the question is how many deaths have to happen, there's an answer. We need to hold the executives who are actually in charge accountable, not out of any desire to hold them accountable, but because the clearly established law from 1991 to the present, beginning with Wilson v. Leiter, which made it crystal clear that extreme temperatures can violate the Constitution. Okay, but I guess what your opponent is saying is these executives were tasked under clearly established law with coming up with policies to mitigate the effects of the hot Texas summers, and they did that. The fact is no policy, prisoners are going to die from all kinds of reasons, regardless of whatever policies they have. So she's saying the fact of death by itself shouldn't decide the issue, because of course, qualified immunity only comes up when there's something to be immune from, and so if everybody's healthy and happy, then there's nothing to need immunity from. So that being the case, she's sufficient constitutionally to satisfy their obligation. So I think that's where we need your input. Fair enough. And our pleadings make clear that these executives knew that there were prisoners in the prison system who were vulnerable to heat illness, who were sick and heat sensitive, who had diabetes, which affects the body's ability to thermoregulate, which had hypertension, which affects the body's ability to circulate, who were on medications such as cyprotropic medications. How did they know? How did they know? They know because they run the prison system. They know because in 2011 and beforehand, they discussed these exact issues in internal meetings. They have established heat policies. They have known since Gates that they are constitutionally obligated to take remedial measures. The issue for this court is what they are saying is, hey, fans and some water is enough, and that's the constitutional minimum, and that's all we need to do, regardless of whether people continue to die. And what the plaintiffs are suggesting is the law that is clearly established is extreme temperatures are dangerous. They know this, and so they have to take measures that actually protect the inmates. But I think her point is, even in Blackmun, we didn't say you have to install air conditioning. Okay? And so she's saying short of that, short of having to install air conditioning, we have this idea of fans, we have this idea of water and showers and ice, and then the problem in Blackmun was it just wasn't happening, but that was the warden. And so she's saying if the executives think that the prisoners are getting their water and ice, but they're not, why is that their liability? Well, it depends how pronounced the failure to get water and ice is and whether they actually know or should know based on the pattern of whether or not they're getting it. In this particular case, though I don't think it's central to the opinion, there are allegations that they were not even taking the remedial measures that the court effectively ordered in Gates. And how would these executives, so if they're sitting there in Austin, issuing proclamations all across Texas, and somebody in El Paso or Longview or Amarillo, far removed from where they are, doesn't follow that policy, how are they supposed to know that until it's too late? Well, if the policy would be effective, then I would agree with you then to hold the highest level of executives responsible would be inappropriate. However, the policy's not effective. They know that the policies are not continuous access to water. They're a 50-gallon jug, or I'm sorry, a 10-gallon jug three times a day, which as the complaint states, is insufficient water. In what case put them on notice that this policy about this jug wasn't good enough? Because she's saying they understood they're supposed to have water. So they have water. You're saying it's not enough water. How are they supposed to know that? What I'm saying is if you decide that all they need to do, which I don't think is the clearly established law, is provide some water, they didn't even do that. And they would know that because it's obvious that providing a 10-gallon jug to 54 prisoners in a housing dorm does not allow them to adequately hydrate. But the bigger issue is the right that's established is the need to protect prisoners from extreme temperatures. And once people start dying, and they began dying as our pleadings show in 1999, that we can verify. But in 2007, as the pleadings indicate and as the briefing indicates, two inmates who were taken to transfer facilities died within days of being presented there. Just like the plaintiffs in this case, they had heat vulnerabilities. This was 2007? That is in 2007. As we provided in 2009, they were internally discussing, hey, what do we know about these heat tests? What can we do to prevent them? Water is not enough. Personal fans is not enough. Now, it's not the negligence argument that they knew about the problem and they didn't adequately address it. Doesn't that sound like negligence? Far from it. They know that they have a constitutional duty to protect prisoners from extreme heat. They know that, and they do do policies for work-related activities, but they have chosen to ignore the housing areas. And while, and this is not a case about mandating air conditioning. What we are saying, but make no mistake, heat stroke is a completely preventable illness. All you need to do is get the temperature down. How they do that is up to them. But what's particularly significant here is that the inmates who have died are not healthy, young inmates. The inmates who have died, they know, are at risk. They have policies for these particular inmates. They are told that people with these types of conditions are at substantial risk of harm when the temperature goes up. And if, I'm sorry. Do we have any evidence? I mean, I understand we have the deaths, and that's obviously the worst thing that can happen, but you had indicated in your brief that, you know, sometimes people have heart attacks. We don't know why. Is there any evidence of people being ill short of death? Yes. As a result of the heat? Yes, there is. There is. There is evidence of people suffering heat cramps, heat rash illnesses, heat exhaustion. In fact, two of the plaintiffs, two of the decedents, Mr. Webb and Mr. Toganidze, had prior episodes of heat illness. They didn't die in 2009. They didn't die in 2010. But they had documented examples of heat-related illness. They died in 2011 when it was especially hot. And it being especially hot is very important because in the TDCJ policies that all three of the executive official defendants know about, they incorporate a chart from the National Oceanographic Institute, essentially, that relays the dangers. At certain temperature levels, extreme caution. At certain other levels, probable death. At certain other levels, I'm sorry, probable heat stroke. Imminent heat stroke. Two of the decedents in this particular case, Mr. Webb and Mr. Toganidze, the heat index temperatures on that day were 136 and 137 degrees, which means, according to their own internal policy, heat stroke was imminent. They do not have any gradation in their policies. They are in charge. They incorporate it. What tells them they need to have that? I'm sorry? What tells them they need to have the gradation? Because she's saying it's just not clearly established. They just don't understand all this. And how can they understand all this? I want your answer to that. It's clearly established for the same reason that in Blackmun, this court held that the warden was not entitled to qualified immunity. It was clearly established. See, the warden's on the ground. The warden's coming in, as I remember in Blackmun, to the exact same hot prison every day. So couldn't say, well, gee, I didn't understand it was hot. And I realize Texas as a whole is hot, but the heat varies from city to city and area to area and this and that. So sitting in Austin in your air-conditioned office, you may or may not know how hot it is somewhere else, whereas the warden clearly knew in Blackmun, or at least arguably did, sufficient to avoid. And I see that Blackmun settled, so I don't guess we ever knew exactly what happened. Well, I mean, in the pleadings, which the court has to take as true, we allege that the three know the temperatures around these prisons. They're based out of Huntsville. They're within an hour and a half of these particular prisons at issue. They know in the summer, especially the summer of 2011, that a heat wave was going on. Their own policies tell them for the wardens to take temperatures every day outside, presumably so that they can have some warning or do something about it. What we have here, however, though, is a system that does a good job of documenting danger and announcing it's dangerous, but does not do anything to protect people from the dangers. And to suggest that 10 deaths from heat stroke is a rare and intermittent thing in one summer defies reality. Okay. You've adverted to, quote, they knew. So does your statement relate to some documents that you have viewed in terms of these discussions or whatever? In other words, what's the source, either in our record excerpts or something else, of your saying, quote, they knew, or there were discussions? Are these emails? Are they letters? Are they recordings? I mean, what? They're emails and they're depositions and they're internal documents, and I think we're a bit beyond the record at this point, but- Well, I'm not trying to get beyond the record. I'm just following your argument saying, quote, they knew, and you said they've discussed, blah, blah, blah, and whatever. And so I'm just trying to link your saying of what they knew to what, you know, we're at the preliminary stage is the dispute is over the order for limited discovery vis-a-vis the qualified immunity. So I'm trying to balance out in my head what's already known, not known, what's in the excerpt versus what is it that you're seeking to discover within this limited, albeit limited order. Our allegation is that they knew based on internal documents that suggest they discussed heat-related illnesses and heat-related problems long ago, that they discussed the 2007 deaths, that they were made aware of the deaths as they were occurring in 2011 through emergency action center reports, that they are the ones responsible for making policies, that they are the ones who have chosen not to make any sort of policy for housing areas despite their knowledge of the danger, their admitted knowledge of the danger. Whether or not they actually knew, however, is not the dispositive question. As courts have held, the danger can also be obvious. And I think it's significant that, you know, Judge Haynes, to your point in the Blackmun case, the three executive officials were not summering in Maine. They are aware of the temperatures in these prisons. They have a responsibility to be aware. They have, there's temperature data from all of these prisons. During 2011, it was well known, it would have been obvious to anyone that there was a heat wave going on. For every one of these people that died, the consecutive amount of days where the temperature, the actual temperature was above 100, was more than 30 days. The heat index got to dangerous levels that their own internal policies document, but they don't change, they don't do anything. They don't, they don't know that people are in danger. They're the ones who have the ability to change it. Why is the rule for county jails different than it is for the state prisons? That is a fantastic question and one that's never been answered. We don't think it should be. There's no rational reason why it should be. Now, technically, the Jail Standards Commission... Do more voters end up in county jails than state prisons? You know, I... That's a question mark at the end. Sure, sure, sure. I know, all I know is, well, the Texas Commission on Jail Standards, which governs and the law which requires counties to keep their prisons between 65 and 85 degrees, that technically does not apply. But in terms of the rationale for having a different temperature in a county jail, there is none. And what that does... You're actually, arguably, in a shorter period in a county jail than you are in a state prison. I mean, that's how it's designed anyway. It may not be the case, but... Right. And what makes it particularly dangerous, and again, it's a knowledge that they know about, is this period of acclimation. The Gurney Unit, which is one of the units which had three deaths by heat stroke, which is an astronomical number in a controlled setting, that is a transfer facility. And they know... And again, I'm talking about the people in charge, the three people who are the highest levels of TDCJ. They know that these transfer facilities pose a particular danger because they come from county jails and they cannot acclimate. Much like the pigs without sweat glands, a person with diabetes has a difficult time and cannot acclimate to the new temperature. And as a consequence, when the temperature is this high, they can die. And that is what's been clearly established, frankly, since 1991. Wilson v. Sider made it clear that in periods of cold, you had to give blankets. It didn't say blankets prevent anything, regardless of how cold the temperature is. What the court said is, look, extreme temperatures are known to be a serious enough danger that it rises to the level of a constitutional violation. Now we have to ask ourselves, did the three officials who are responsible for enacting policies at TDCJ and actually protecting people, did they know about the danger and did they turn a blind eye to it? And our position is, yes, they did. And they did because there was no change made once those deaths happened in 2007. What about now? Has anything changed in the intervening three years? No. Okay. So it's continuing to happen that if we have some massive heat wave, we're going to have more deaths and these three officials have done nothing to address that. Well, I think that's a little bit beyond the record. But if we have a similar summer to 2011, because we have people who have heat-sensitive disabilities in prison, people who cannot regulate their temperature, and it is clear from the evidence that the temperatures are going to up into the danger levels that people will die. Now, this is not a case about injunctive relief at this point in terms of stopping that practice. But yes, more people will die. Well, the reason why I think it's relevant is because qualified immunity is a judicial doctrine to try to protect, you know, anybody who's going to handle prisoners, a school teacher at a school, you're going to deal with people who are conscripted to be there at one degree or another and aren't always going to be happy. And so they sue a lot. Prisoners sue a lot. A school child might be unhappy, might sue, so on and so forth. And we can't have officials in a position of being constantly sued. So, I mean, I think that's the position is to protect them not from frivolous lawsuits, but just from being constantly sued over everything under the sun because then nobody would ever take the job. But that said, it's qualified because we don't want people sort of quote, getting away with murder. And I'm not saying that's what occurred here, but just that there's a there's a balancing there. But it is a judicial doctrine. So, I mean, we as judges have to address that doctrine. My time is up, but if I may briefly respond. Yeah, go ahead. You know, the other reason it's very important that that there have not been changes to the housing policies or frankly, a housing policy adopted or cooling measures installed is that post-event conduct is relevant to a party's deliberate indifference. And I just want to urge, we are at the motion to dismiss stage here, just the pleading stage. And in terms of going forward with discovery, all of the district judges who have found that a constitutional violation was in fact stated have put curbs on discovery and made it clear. And we've gone through a chart in the briefing, which explains why the particular items. And it's on page 62 of the brief. And it just lists out why exactly it goes to the heart of deliberate indifference. And thank you very much for your time. Okay, thank you, sir. All right, back to you, Ms. Burton. Let's just take a step back and take a look at the prison system as a whole and what the clearly established law was in 2011. Because plaintiff's argument wants this court to find that these when in fact they were taking steps to care for the prisoners, as has been demonstrated in numerous years and for 10,000s. That's what they want. Thousands and thousands. So why not allow that discovery that will establish that? Because all they would have to do then after this case, if this court allows that, is point to a policy they feel is deficient. Whether they've got a solution that would solve the problem 100% or not, all they would have to do is plead a policy they think is deficient and that it was not 100% successful. And these executive defendants will be able to be hauled into court over and over and over, over the thousands of policies that TDCJ has. You keep saying it's 100% and I recognize the position you take, but just trotting out the parade of horribles isn't necessarily responsive. They're named plaintiffs in the case. It's not a class action. It's a suit on behalf of individuals who've died, et cetera, et cetera, that's what they're as opposed to Ruiz and these cases that were systemic lawsuits against the whole prison system, et cetera, et cetera. So I'm just trying to reel back a little bit in your argument. You keep saying, well, they want 100% guarantee, like it's absolute immunity, I mean, absolute liability, strict liability. And I'm listening, but not quite following that. The overbridge just a little bit overstated, I'll just put it that way. This 100%, I didn't read the pleadings as looking for a full proof. Obviously one death is too many, but as here, it just doesn't sound to me that that's it. Now, the question is that what's here, the district court granted limited discovery within the context of qualified immunity. Now, we all understand the defendants you represent for good reasons. Don't want any discovery, you want to get out of the case now, we got that. But we do have cases where we've allowed the district courts to cabin in, monitor, very limited, et cetera, discovery so as to either ascertain or not that which ferreted out. Is it any discovery at all, or is it, you say this is outside of the bounds of what our court has allowed in other cases, and if so, how is this order different from some others that we have? You understand my question? Yes, Your Honor. Okay. All right. They have, the discovery order specifically includes inquiries into whether the policies or procedures were, if any, were followed in this case. And that is what we're saying is an on the ground question. We do not dispute at this early pleading stage that from regional director on down, discovery is going to take place as to what happened with each of these offenders. Each death is important. But the question is whether you can do discovery with regard to the executive defendants on those kinds of questions. Okay. You're saying the executive defendants are removed from ground level where they would have been. And these discovery orders are basically asking them to answer all the way down through the merits. But if they don't have any knowledge, I mean, why can't they just say no or they don't know? You're saying that might trigger further liability about why they don't know? It makes sense. But there's different kinds of knowledge. On the one hand, like the discovery order talks about the individual who passed away, Mr. Webb or Mr. Adams. Okay. These executive defendants can answer no, I did not know Mr. Webb. And that's obvious. We don't need to do discovery about that. We already know that's the case. That they don't know an individual offender. And yet the discovery order talks about specifically what happened to Mr. Webb. Now, as far as what on a bigger picture, there's no dispute here that Texas summers are hot. There is no dispute that most of the housing areas in Texas Department of Criminal Justice are not air conditioned. The dispute here is that the plaintiffs actually want a rule that says air conditioning is constitutionally required or these executive defendants are going to be held liable individually. Okay. Where do you get that? Where is that in the plea? Okay. Pardon me? I read a whole lot. Because in every complaint, but they don't use the word. They don't use the word constitutionally required, but they constantly say when they attack the policies of the executive. Just help me briefly. I'm probably the slowest one up here in gearing up on this. Just tell me where, if you can, in this complaint that the district court missed, that sweeping allegation that you're saying is made wanting this wholesale change and wanting air conditions to just point me. I'm going to look, but just tell me. All right. Now, don't tell me if it can be interpreted that way. I want you to tell me where in the complaint it's saying all that. Okay. Let's take an example of the Adams complaint. Air conditioning was never discussed, nor was moving heat sensitive offenders to AC units discussed. No steps were taken to cool or upgrade facilities. No steps were taken to condition gurney unit. Then on their brief, page 37, again, repeat, failure to cool. They talk at page 38 that their air conditioning was never discussed. They do not offer this court or TDCJ any solution other than cooling. Okay? It's repeated throughout these complaints. Now, I know the district court noted in their order that the plaintiffs didn't say air conditioning was constitutionally required, but in fact, the policy they are complaining about is the lack of cooling, the practice, and for these executives, defendants to be held liable at this stage, the policy must be a repudiation of constitutional values. Okay? And so they have not established that in the pleading that these policies are repudiation. We are therefore asking this, and I see my time is up, it is, but I thank you for listening. It is, but I commend you in responding to my question. That was a fair response and very helpful to at least let me understand better the argument that you were making. I mean, there's a lot to read here and all that, and we'll read it, but that was responsive, and we thank both counsel and both sides for briefing the case and arguing, and we'll take it under submission and give it our best shot. Thank you for your attention. All right. Thank you.